## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | Civil Action No.:  3:22-cv-00703 |
| Plaintiff, | **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL** |
| vs. | |
| JOHN AND JANE DOES 1-100, and XYZ CORPORATIONS 1-100, | |
| Defendants. | |

Plaintiff World Wrestling Entertainment, Inc. ("WWE"), by and through its undersigned attorneys, alleges the following in support of its Complaint against Defendants John and Jane Does and XYZ Corporations.

### NATURE OF THE CASE

1.      This is an action for trademark infringement, counterfeiting and dilution under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d), and related state law claims for trademark infringement, dilution and unfair competition occasioned by Defendants' unlawful manufacture, distribution and/or sale of counterfeit merchandise bearing unauthorized copies of WWE's registered and unregistered trademarks and service marks.   WWE brings this action to (i) protect its reputation for selling merchandise of the highest quality and grade; (ii) prevent deception of the consuming public by Defendants; (iii) retain control over the substantial goodwill associated with the numerous registered and

unregistered trademarks and service marks being unlawfully exploited by Defendants; and (iv) avoid irretrievably lost sales.

2.      To achieve these goals and utilizing the procedures provided under Section 116(d) of the Lanham Act, WWE seeks an *Ex Parte* Temporary Restraining Order; Order for Seizure of Counterfeit Marked Goods; and Order to Show Cause Why a Preliminary Injunction Should Not Issue, authorizing the seizure of such counterfeit merchandise.

3.      Specifically, WWE seeks injunctive relief to prevent Defendants from unlawfully infringing WWE's intellectual property rights through Defendants' manufacture, distribution and/or sale of counterfeit merchandise bearing WWE's registered or unregistered marks and the names or likenesses of its wrestlers at its live events in Dallas and Arlington, Texas, on April 1 through April 4, 2022, during WWE's WrestleMania® 38 weekend—the kick-off of WWE's 2022–2023 tour—and at WWE live entertainment events throughout 2022-2023 ("WWE's 2022–2023 Live Events"). WWE's WrestleMania® 38 weekend will consist of various events taking place in Dallas and Arlington, Texas, from April 1 through April 4, 2022, including, but not limited to, (1) WWE's  Hall of Fame Ceremony at American Airlines Center on April 1, 2022; (2) WWE's Friday Night Smackdown® at American Airlines Center on April 1, 2022; (3) WWE's NXT® Stand & Deliver at American Airlines Center on April 2, 2022; (4) WWE's WrestleMania® 38 event at AT&T Stadium on April 2–3, 2022; and (5) WWE's Monday Night RAW® at American Airlines Center on April 4, 2022 (collectively, the "WrestleMania® 38 Weekend Events").

## PARTIES

4.     Plaintiff WWE is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902.

5.     Defendants John and Jane Does and XYZ Corporations, whose precise identities are not yet known to WWE, are individuals and entities who, upon information and belief, have been doing business, continue to do business, or will be doing business in the Northern District of Texas, or are now conspiring and otherwise traveling to WWE's 2022–2023 Live Events at the other venues listed in Exhibit 3 attached hereto. The Complaint will be amended to include the names of individuals and companies if and when they permit themselves to be identified.

6.     Based upon information and belief, WWE's past experiences with counterfeiters and its investigation into the matter, all Defendants are acting in concert and active participation with each other in connection with the wrongful acts alleged below.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over the Defendants because they reside in and/or have transacted or will be transacting business in this State, and have caused harm or tortious injury in this State, including as part of a conspiracy that has caused harm or injury in this State.  Upon information and belief, Defendants are individuals and entities who will be present in the Northern District of Texas in connection with the claims asserted below and/or who, at all times relevant hereto, have

311861647.1

done business, continue to do business, or will be transacting business in the Northern District of Texas.

8.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b).   This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), with respect to the state law claims asserted herein.

9.     This Court is an appropriate venue for this action under 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to WWE's request for relief will occur in this district.

## FACTUAL BACKGROUND

A.     **WWE's Business And Marks**

10.     WWE is an integrated media and entertainment company that consists of a portfolio of business that create and deliver original content 52 weeks per year to a global audience.

11.     WWE has been involved in the sports entertainment business for four decades, and has developed WWE into one of the most popular brands in global entertainment today.   WWE is principally engaged in the production and distribution of unique and creative content through various channels, including the WWE Network, which is available to U.S. subscribers via the Peacock paid streaming service, content rights agreements, pay-per-view event programming, filmed entertainment, live events, licensing of various WWE themed products, and the sale of consumer products featuring WWE's brands.

311861647.1

12.     WWE's unique content, for which it coined the term "sports entertainment," is perhaps best described as an action-adventure episodic drama that is akin to an ongoing, ever-developing soap opera based around WWE's wrestlers.  WWE creates colorful characters that generally wrestle under a trademarked name and are distinctively delineated with unique persona, history, relationships, music, visual appearance, and behavior.

13.     Since at least as early as February 1983, WWE, first doing business as the "World Wrestling Federation" and now doing business as "World Wrestling Entertainment," has provided to the public live and televised wrestling and entertainment events and services (the "WWE Wrestling Services").  In connection therewith, WWE has used, advertised, publicized and presented the WWE Wrestling Services, and related souvenirs, merchandise and other products ("WWE Merchandise") under its WORLD WRESTLING ENTERTAINMENT® mark and certain other service marks and trademarks (collectively, the "WWE Marks").  A listing of those WWE Marks, both currently pending or registered with the United States Patent and Trademark Office and unregistered but exclusively owned or controlled by WWE, is set forth in Exhibits 1 and 2 hereto, respectively.  Among the marks most important to this action are:

| Mark | U.S. Trademark Registration Nos. |
| --- | --- |
| WORLD WRESTLING ENTERTAINMENT | 2,818,358; 2,772,677; 2,757,599; 2,754,499; 2,870,426; 2,902,203; 2,917,910; 3,585,170; 3,585,171 |
| WWE | 2,772,683; 3,056,074; 3,541,936; 4,451,697; 3,538,710; 3,489,357; 3,412,176; 3,412,177; 3,541,956; 3,621,017 |

| WWE Logos | 4,735,547; 4,731,795; 4,735,546; 4,625,255; 4,727,923; 4,675,657; 4,538,209; 4,689,839; 4,689,835; 4,538,210; 4,614,144; 4,645,471; 4,552,144; 2,757,596; 2,754,495; 2,846,450; 2,799,228; 2,751,436; 2,757,597; 2,765,751; 2,751,437; 3,412,169; 3,412,170; 3,691,588; 4,220,594; 5,291,266; 3,473,626; 3,115,074; 3,042,792 |
|---|---|
| WRESTLEMANIA | 1,432,884; 1,863,534; 2,625,125; 2,881,508; 3,351,858; 3,351,859; 3,727,338; 3,727,339; 4,285,112; 4,780,778; 4,923,842; 5,094,698 |

The WWE Marks are well known to the public and have come to identify WWE to the public as the genuine source and sponsor of WWE Wrestling Services and WWE Merchandise. WWE exclusively owns or controls all right, title and interest in the WWE Marks and in the names, likenesses and rights of publicity for its current wrestlers known as "Superstars" uses those names, likenesses and rights of publicity in commerce.

14.    WWE's 2022–2023 Live Events are a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world.  The itinerary of WWE's 2022–2023 Live Events is attached hereto as Exhibit 3.  Most major U.S. cities will have a WWE live event appear in their city at least once or twice a year.  WWE's 2022–2023 Live Events include all of the following types of programs:  (1) live, pay-per-view events; (2) live, nationally-televised shows; and (3) live, non-televised events known as "house shows."  In addition to generating revenues through ticket sales and promoting its pay-per-view events, WWE sells a significant portion of WWE Merchandise at its 2022–2023 Live Events.

6

15.     WWE presents multiple WORLD WRESTLING ENTERTAINMENT® pay-per-view events per year.  One of WWE's annual marquee pay-per-view events is called "WrestleMania®" which is distributed through satellite providers and the WWE Network, which is available to U.S. subscribers via the Peacock paid streaming service.

16.     WWE's WrestleMania® event typically is the biggest wrestling event of the year for WWE and generally highlights most popular Superstars in high-profile storylines.  WWE's pay-per-view events, including WrestleMania®, are extensively promoted and widely attended and viewed.

17.     For example, WrestleMania® 30 in 2014 at the Mercedes-Benz Superdome in New Orleans, Louisiana, drew a sold-out crowd of 75,167 spectators from all 50 states as well as 36 foreign countries, and was watched by more than one million households in the United States through pay-per-view or the WWE Network.

18.     WrestleMania® 31 in 2015 at Levi's Stadium in Santa Clara, California, drew over 76,000 spectators from all 50 states and 40 countries, and over 1.3 million subscribers through pay-per-view or the WWE Network.

19.     WrestleMania® 32 in 2016 occurred at AT&T Stadium in Arlington, Texas, drew a crowd of 101,763 from all 50 states and 35 countries, and was viewed by 1.82 million subscribers through the WWE Network.  Moreover, WrestleMania® 32 was mentioned 2.5 million times on Twitter during the day of the broadcast.

20.     WrestleMania® 33 in 2017 at Camping World Stadium in Orlando, Florida, drew an attendance of 75,245 and was the most-watched WrestleMania® history, reaching a record 1.95 million global households on the WWE Network alone.

311861647.1

21.     WrestleMania® 34 in 2018 at the Mercedes-Benz Superdome in New Orleans, Louisiana, drew a sold-out crowd of 78,133 spectators from all 50 states as well as 67 foreign countries.

22.     WrestleMania® 35 in 2019 at MetLife Stadium in East Rutherford, New Jersey, drew a sold-out crowd of 82,265 fans from all 50 states and 68 countries.

23.     Because of the COVID-19 pandemic, WrestleMania® 36 in 2020 took place without any spectators and WrestleMania® 37 in 2021 had restricted attendance.

24.     WWE's WrestleMania® also has generated record merchandise sales for the venues.   For example, WrestleMania® 33 grossed $14.5 million in revenue, breaking every Camping World Stadium record.

25.     WrestleMania® 34 grossed $14.1 million, making it the Mercedes-Benz Superdome's highest grossing entertainment event.

26.     WrestleMania® 35 grossed $16.9 million, surpassing MetLife Stadium's previous record of $12.3 million set by WrestleMania® 29.

27.     In addition to its pay-per-view events, WWE currently distributes three weekly WWE programs that feature wrestling entertainment programing: (1) "RAW®" on the USA Network cable television channel ("USA Network") every Monday night nationwide; (2) "WWE NXT®" on USA Network every Tuesday night nationwide; and (3) "Smackdown®" on the Fox television network every Friday night nationwide.

28.     Additionally, WWE distributes through the WWE Network a video library that includes, among other things, live streamed original programming and pay-per-view events, as well as "on demand" prior pay-per-view and televised events.   WWE also

8

syndicates its video content on Hulu and YouTube including full length episodes and clips of "RAW®," "Smackdown®" and a variety of classic content and original short-form webisodes.

29.     At its Live Events, in retail stores nationwide, and via on-line, WWE sells a large variety of WWE Merchandise featuring the WWE Marks.   The WWE Merchandise typically displays prominently the name and logo of the company, the WWE Marks, its events, its programs, and/or its Superstars and other personalities involved with the events and programs.   Examples of WWE Merchandise   include without limitation, T-shirts, jerseys, sweatshirts, caps, hats, belts, wrestling masks, sunglasses, key rings, action figures, posters, and DVDs.

B.     **Counterfeiting At Previous Live Events**

30.     For many years, WWE has sold the WWE Merchandise at and in connection with its live events.   WWE's venue merchandise business consists of the design, sourcing, marketing and distribution of numerous WWE-branded products, such as t-shirts, caps and other novelty items, all of which feature WWE's Marks, WWE's Superstars and/or logos, including WORLD WRESTLING ENTERTAINMENT®, WWE®, the WWE® logo, and/or one or a number of other WWE Marks included in Exhibits 1 and 2 hereto.   In 2019 (the last full year of WWE live events before the COVID-19 pandemic), venue merchandise net revenues were approximately $18.6 million.

31.     WWE Merchandise is of the highest quality and grade.   These genuine goods currently are being sold only at authorized locations throughout the United States

including, but not limited to, the house show arenas and live event venues, and retail stores in the Northern District of Texas, as well as authorized online retail stores such as WWE's e-commerce website at www.shop.wwe.com.

32.   Based upon information and belief, WWE's past experiences and its investigation into the matter, WWE asserts that Defendants, alone and in conjunction with other, similarly situated individuals and entities -- specifically numerous peddlers and manufacturing and distribution companies -- will attempt to sell or distribute goods of inferior quality to those sold, or licensed for sale, by WWE at or near WWE's 2022–2023 Live Events.  These goods, which are marked with imitations or counterfeits of the WWE Marks, include, *inter alia*, T-shirts, sweatshirts, and other souvenirs, merchandise and memorabilia ("Counterfeit Merchandise").

33.   For example, at WWE's WrestleMania® 27 weekend events, held on March 30 through April 4, 2011, in Atlanta, Georgia, WWE encountered an untold number of individuals, who came from all over the United States, distributing and selling Counterfeit Merchandise.  With the aid of an *ex parte* TRO and seizure order granted by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the WrestleMania® 27 weekend events.  The t-shirts were being sold for at least $10 per shirt.

34.   At the WrestleMania® 28 Weekend Events in Miami, Florida, in 2012, WWE again encountered numerous counterfeiters from various states selling bootleg merchandise.  In the course of enforcing an *ex parte* TRO and seizure order issued by the

10

United States District Court for the Southern District of Florida, WWE seized hundreds of counterfeit shirts.  Most of those shirts were child-sized and emitted a strong unknown chemical odor, which further increases and heightens the public safety concern.

35.     Evidencing and confirming the coordinated nature of Defendants' illegal activities, two of the counterfeiters who were served in Miami, Florida, in 2012 had previously been served at WrestleMania® 24 in Orlando, Florida, in 2008 pursuant to an *ex parte* TRO and seizure order issued by this Court.  In addition, as described in more detail below, two of the defendants who were served in **Miami, Florida, in 2012** were served again in **New Orleans, Louisiana, in 2014.**  These facts establish Defendants' complete disregard for the law and their intent to follow WWE Live Events around the United States.

36.     In 2013, WWE's WrestleMania® 29 was held in East Rutherford, New Jersey. WWE again encountered numerous counterfeiters from various states selling bootleg merchandise.  In the course of enforcing an *ex parte* TRO and seizure order issued by the United States District Court for the District of New Jersey, WWE seized thousands of counterfeit T-shirts, DVDs, action figures and posterboards.  WWE also obtained a consented to permanent injunction against one of the counterfeiters that WWE served in connection with the court's TRO and seizure order.

37.     In 2014, WWE's WrestleMania® 30 events were held in New Orleans, Louisiana.  Initially, the United States District Court for the Eastern District of Louisiana denied WWE's request for an *ex parte* TRO and seizure order on the ground that WWE had not pleaded sufficient specific facts about the unknown counterfeiters' identities.

11

WWE appealed that order and the Court of Appeals for the Fifth Circuit vacated the decision and held that WWE, based upon similar allegations to those alleged here, had established its entitlement to a TRO and Seizure Order.

38.     Without the benefit of a TRO and seizure order, WWE's ability to combat counterfeit sales was significantly hampered.  However, WWE was able to identify the putative names of four individuals who were caught selling counterfeit merchandise. WWE was not able to obtain contact information for all four individuals, and the contact information it did obtain turned out to be false.

39.     WWE filed two amended Motions for TRO and Seizure Order against the four identified individuals, which the United States District Court for the Eastern District of Louisiana granted.  As alleged above, two of the identified individuals had been previously served in Miami in 2012 pursuant to an *ex parte* TRO and seizure order granted by the Southern District of Florida in connection with WrestleMania® 28.  The individuals did not participate in the Southern District of Florida proceeding and likewise failed to return process or enter an appearance in the Eastern District of Louisiana's proceeding.

40.     In 2015, WWE obtained and enforced an *ex parte* TRO and seizure order issued by the United States District Court for the Northern District of California for WrestleMania® 31 events in San Jose and Santa Clara, California.  In connection with the Northern District of California's order, WWE served several counterfeiters and seized their counterfeit merchandise.  After the WrestleMania® 31 events, WWE entered into a settlement agreement that permanently enjoined three of the named counterfeiters.

311861647.1

41.     In 2016, this Court issued WWE an *ex parte* TRO and seizure order for WWE's WrestleMania® 32 events in Dallas and Arlington, Texas.  With the assistance of local law enforcement, WWE was able to obtain the names of several counterfeiters and obtained a permanent injunction against two of the counterfeiters that WWE served in connection with the court's TRO and seizure order.

42.     In 2017, this Court issued WWE an *ex parte* TRO and seizure order for WWE's WrestleMania® 33 events in Orlando, Florida.  Pursuant to this Court's order, WWE seized hundreds of counterfeit items and served four individuals, including one individual who had traveled nearly 500 miles from Canton, Georgia.

43.     In 2018, the United States District Court for the Eastern District of Louisiana issued WWE an *ex parte* TRO and seizure order for WWE's WrestleMania® 34 events in New Orleans, Louisiana.  However, due to the large police presence that apparently scared off any would-be counterfeiters, WWE did not encounter bootleggers or seize any goods.  Thereafter, WWE dismissed the case without prejudice and without moving for any additional relief from the court.

44.     In 2019, the United States District Court for the District of New Jersey issued WWE an *ex parte* TRO and seizure order for WWE's WrestleMania® 35 events in East Rutherford, New Jersey.   WWE engaged a team of local law enforcement officers and others to enforce the Court's TRO and seizure order.  With the assistance of local law enforcement, WWE seized seven hundred counterfeit T-shirts.  Most of these T-shirts were in children's sizes and emitted a strong unknown chemical odor.

311861647.1

45.     After WrestleMania® 35, WWE continued to encounter counterfeiters at its Live Events.  For instance, on October 4, 2019, WWE encountered numerous counterfeits at its WWE Smackdown® event held in Los Angeles, California, at the Staples Center. These counterfeiters were selling "WWE Smackdown® 20th Anniversary" shirts that displayed counterfeit WWE Marks on the front and a list of WWE event locations on the back.

46.     Further, on January 10, 2020, WWE encountered additional counterfeits at its WWE Smackdown® Live event held in Evansville, Indiana, at the Ford Arena.  These counterfeiters were selling "RAW®" and "Smackdown®" shirts that displayed counterfeit WWE Marks and Superstars on the front and a list of WWE® Live events on the back, including listing the WrestleMania® 36 event in the Tampa, Florida, area.

47.     In 2020, due to the COVID-19 pandemic and resulting state restrictions on audience attendance at live entertainment events, WWE relocated WrestleMania® 36 to a WWE training facility and did not admit audience members.  Without an audience to whom counterfeiters could sell the Counterfeit Merchandise, WWE did not seek an *ex parte* TRO and seizure order for WrestleMania® 36 events.

48.     Similarly, in 2021, COVID-19 audience attendance restrictions limited the audience at WrestleMania® 37 to a fraction of the events' normal attendance.  As in 2020, WWE, therefore, did not seek an *ex parte* TRO and seizure order for WrestleMania® 37 events.

49.     At no time has WWE authorized Defendants to manufacture, distribute, offer for sale or sell any Counterfeit Merchandise, nor any WWE Merchandise or goods or materials bearing the WWE Marks not specifically licensed and approved by WWE.

50.     Based upon its investigation into the matter, and as described more fully in the Declaration of Lauren Dienes-Middlen, Esq., WWE has observed that the design, materials and quality of most of the Counterfeit Merchandise being distributed and sold at WWE live events throughout the United States is poor and uniform from event to event and city to city.   Indeed, WWE has encountered Counterfeit Merchandise that lists multiple WWE live events making it easy for such merchandise to be sold from venue to venue.   In addition, the merchandise sold by Defendants not only is counterfeit but the merchandise also threatens public safety.   Based on past experience, there are concerns about the quality of the counterfeit goods, such as the flammability level of the ink used to print the t-shirts, and the safety of the design of other goods, including wrestling face masks.

51.     Based on these experiences, WWE believes and avers that Defendants distributing and selling Counterfeit Merchandise are part of a concerted operation that travels and works together from venue to venue to sell unauthorized Counterfeit Merchandise likely acquired from common sources of manufacture.   Many of the individual Defendants sell the same Counterfeit Merchandise in different cities.   Groups of these individuals travel together from event to event, including in the Northern District of Texas.

52.     Thus, without the aid of a federal court order authorizing seizure of Counterfeit Merchandise, WWE is unable to combat the network of individuals and entities distributing and selling unauthorized Counterfeit Merchandise at WWE live events and is effectively thwarted in protecting its rights, and the rights of the consuming public, against the unauthorized and unlawful distribution and sale of Counterfeit Merchandise at WWE live events.

53.     As demonstrated by the Dienes-Middlen Declaration, throughout the past several years of WWE live events with audience attendance permitted, WWE has encountered numerous sellers of Counterfeit Merchandise at various locations throughout the United States.

54.     During the course of WWE's enforcement of TROs, Seizure Orders and preliminary injunctions entered by this Court, the District Court for the District of New Jersey, the District Court for the Southern District of Texas, the District Court for the Southern District of Florida, the District Court for the Northern District of Georgia, and prior similar orders, including those entered by the District Court for the District of Massachusetts and the District Courts for the Eastern and Southern Districts of New York, WWE has seized thousands of counterfeit T-shirts, caps, wrestling masks, posters, DVDs, pictures and other items of Counterfeit Merchandise marked with imitations of the WWE Marks. As a result of WWE's ability to seize Counterfeit Merchandise, WWE was able to avoid some lost sales and, more importantly, lessen the irreparable injury to WWE's reputation and goodwill with the consuming public that is caused by Defendants' illegal conduct. In addition, as a result of WWE's ability to seize Counterfeit

Merchandise, WWE was able to protect the safety of the public, including children, against potential harmful effects of such uncontrolled, inferior and potentially dangerous goods.

55.    Pursuant to past TROs, Seizure Orders and preliminary injunctions, WWE has posted a bond and proceeded at all times with the utmost caution in seizing only those goods that WWE's enforcement team determined to be Counterfeit Merchandise.  WWE enforced the TROs, Seizure Orders and preliminary injunctions in a manner designed to protect its trademarks and service marks without compromising the rights of the Defendants in those actions.

56.    Many of the individuals served under these prior TROs, Seizure Orders and preliminary injunctions refused to identify themselves, refused to accept service, or both.  In addition, with respect to those that do not accept service, many of them provide fake identification.  Moreover, none of the Defendants in those actions came forward with objections to the court.  Such behavior is typical of counterfeiters who distribute and sell unauthorized merchandise at live entertainment events.

57.    The TROs, Seizure Orders and preliminary injunctions issued in the past enabled WWE to effectively police distribution and sale of Counterfeit Merchandise throughout WWE's nationwide series of live events.  Defendants' conduct, however, represents a continuing problem, not yet abated, and the only effective relief available to WWE is the *ex parte* seizure process.

58.    Without the ability to seize Counterfeit Merchandise at and near venues where WWE live events occur, including, but not limited to, at or near the

WrestleMania® 38 Weekend Events in Dallas and Arlington, Texas, from April 1 through April 4, 2022, WWE stands (i) to lose merchandise sales; (ii) to suffer incalculable, irreparable damage to its reputation and goodwill; and (iii) to lose the ability to protect the safety of WWE's consuming public—who specifically decide to buy tickets and attend WWE's live events—against potential harmful effects of the inferior and potentially dangerous Counterfeit Merchandise sold right outside WWE's live events.

### C.   Expected Counterfeiting At WrestleMania® 38 Weekend Events in Dallas and Arlington, Texas, and Elsewhere

59.     WWE's WrestleMania® 38 Weekend Events are scheduled for April 1, 2022, through April 4, 2022. The events include, but are not limited to, (1) WWE's  Hall of Fame Ceremony at American Airlines Center on April 1, 2022; (2) WWE's Friday Night Smackdown® at American Airlines Center on April 1, 2022; (3) WWE's NXT® Stand & Deliver at American Airlines Center on April 2, 2022; (4) WWE's WrestleMania® 38 event at AT&T Stadium on April 2–3, 2022; and (5) WWE's Monday Night RAW® at American Airlines Center on April 4, 2022.  WWE's 2022–2023 Live Events will be promoted at venues in cities throughout the United States according to the schedule attached hereto as Exhibit 3.

60.     In connection with its WrestleMania® 38 Weekend Events and its nationwide 2022–2023 Live Events, WWE has advertised and promoted heavily, and will continue to advertise and promote heavily, the WWE Marks in interstate commerce.

61.     As demonstrated herein and in WWE's accompanying brief in support of the Motion for TRO filed concurrently herewith, the only effective means of protecting WWE's trademarks and service marks from unlawful counterfeiting by Defendants at

311861647.1

WWE's live events is through the *ex parte* seizure process, which provides WWE with the ability to fight against unlawful counterfeiting.  To maintain any meaningful defense against the unlawful distribution and sale by Defendants of Counterfeit Merchandise at WWE live events, which is an ongoing problem inherent in the live entertainment industry, WWE must be allowed to proceed with the *ex parte* seizure process.

62.    As noted, Defendants are habitual "repeat offenders" who refuse to identify themselves or accept service, much less appear in court in connection with the seizure of their unlawful goods.  WWE would welcome their appearances in court, as it would permit WWE to identify the bootleggers, take discovery from them, discover their manufacturing and printing sources and pursue them for money damages.

63.    But aware of the illegality of their activities, these individuals and groups, if caught, will quickly hide or dispose of their Counterfeit Merchandise, or load it into a waiting vehicle and lock the vehicle or drive it away.  Most sellers have only a small number of items at any given time and their supply is replenished after being seized by WWE.  In fact, WWE has encountered this exact modus operandi consistently over the years.  Thus, Defendants are organized and acting in concert with one another and are making a conscious effort to hide their identities.

64.    Defendants are without offices, identification, licenses or addresses.  In this manner, they can avoid having to respond to an ordinary civil lawsuit and thus are essentially immune from litigation, or even an injunction, unless it is accompanied by authority to seize Counterfeit Merchandise.

311861647.1

65.     By refusing to identify themselves, refusing to accept service, and/or refusing to come forward to respond formally in court, Defendants continue, undaunted, to attempt to peddle Counterfeit Merchandise at WWE live events.  WWE's only means of keeping their conduct under control is through the *ex parte* seizure process.

66.     Based upon the foregoing, and based upon its experience enforcing earlier TROs, Seizure Orders and preliminary injunctions as explained in the Dienes-Middlen Declaration, WWE believes and therefore avers that Defendants will follow WWE from city to city, throughout the country, selling Counterfeit Merchandise.  Defendants constitute bootlegging rings that operate in this District by obtaining Counterfeit Merchandise from a small number of manufacturers.

67.     On information and belief, Defendants will attempt to sell Counterfeit WWE Merchandise at WWE's WrestleMania® 38 Weekend Events and other live events.

68.     *Ex parte* seizure relief thus is essential if WWE is to maintain a defense against and effectively police the unlawful activities of Defendants.  Without such relief, WWE will have no effective remedy against Defendants' continued distribution and sale of Counterfeit Merchandise that infringes WWE's registered and unregistered trademarks and service marks, threatens lost sales in untold dollars, deceives the consuming public into mistakenly believing they are purchasing authorized, licensed, high quality goods, and poses a potential safety risk because of the inability for WWE to control the quality of the materials used by the bootleggers.

311861647.1

**D.**     **Irreparable Harm To WWE**

69.     Defendants' use of counterfeits of the WWE Marks on the Counterfeit Merchandise will deceive the consuming public into believing that they are purchasing genuine goods which have been manufactured, authorized, or approved by WWE, and will likely cause confusion and mistake in that consumers are likely to assume that WWE has manufactured, authorized, or approved the Counterfeit Merchandise sold by Defendants.

70.     In addition to causing WWE to suffer incalculable, irrecoverable and irreparable lost sales, Defendants' manufacture, distribution and sale of inferior quality Counterfeit Merchandise displaying the WWE Marks will irreparably injure WWE's reputation for the manufacture and sale of the highest quality souvenirs, merchandise, and memorabilia and poses a potential safety risk to the public because WWE is unable to control the quality of the materials used by the bootleggers.  Indeed, there is no way to know the quality of the counterfeit goods, such as the flammability level of the ink used to print the t-shirts and the safety of the design of other goods, such as wrestling masks, that previously have been seized.  For example, much of the counterfeit merchandise seized at prior WrestleMania® events consisted of child-sized t-shirts and emitted a strong unknown chemical odor, which further increases and heightens the public safety concern.

**COUNT I**
**Trademark Infringement (Registered Marks)**

71.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 70 of this Complaint.

72.     The WWE Marks identified on Exhibit 1 are registered.

21

73. The WWE Marks on WWE Merchandise have become well and favorably known to consumers throughout the United States, including Texas, as an indication of goods emanating from or authorized by a single source, *i.e.*, WWE.

74. Defendants' use of counterfeits of the WWE Marks on the Counterfeit Merchandise constitutes infringement of WWE's registered trademarks in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114.

75. The threat of the loss of WWE's right to control the use of its marks and the reputation of its goods is real and substantial. This loss is further enhanced by the inferior quality of Defendants' Counterfeit Merchandise.

76. Defendants' acts described herein will infringe the WWE Marks, will injure WWE's business, reputation, and goodwill, and unless restrained and enjoined will continue to do so, all to WWE's monetary damage and irreparable harm.

## COUNT II
### Trademark Infringement (Unregistered Marks) and False Designation Of Origin

77. Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 70 of this Complaint.

78. Defendants' use of the WWE Marks on the Counterfeit Merchandise constitutes infringement of WWE's unregistered trademarks in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

79. Defendants' use of the WWE Marks on the Counterfeit Merchandise creates a false designation of origin and a false representation of Defendants' goods, all in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

22

80.     The threat of the loss of WWE's right to control the use of its marks and the reputation of its goods is real and substantial.  This loss is further enhanced by the inferior quality of Defendants' Counterfeit Merchandise.

81.     Defendants' acts described herein will infringe the WWE Marks, will injure WWE's business, reputation, and goodwill, and unless restrained and enjoined, will continue to do so, all to WWE's monetary damage and irreparable harm.

### COUNT III
### Trafficking In Counterfeit Goods

82.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 70 of this Complaint.

83.     Defendants' souvenirs, merchandise, and memorabilia constitute goods bearing counterfeit marks.  Defendants have trafficked these goods in violation of the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d) and unless restrained and enjoined, will continue to traffic these goods, all to WWE's monetary damage and irreparable harm.

### COUNT IV
### Trademark Infringement and
### Unfair Competition, Under Texas Law

84.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 70 of this Complaint.

85.     The WWE Marks are marks valid at common law.

86.     Defendants' unauthorized use of the WWE Marks is likely to cause confusion, or mistake or to deceive as to the source of Defendants' goods and services, which constitutes trademark infringement and dilution under the common law of Texas.

23

311861647.1

87.     Defendants' unauthorized use of the WWE Marks constitutes trademark infringement, trademark dilution and unfair competition under Texas common law and Tex. Bus. & Com. Code §§ 16.102 and 16.103.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff World Wrestling Entertainment, Inc. respectfully prays:

1.     That this Court grant a temporary restraining order and a preliminary and permanent injunction enjoining Defendants and each of his, her, or their partners, associates, agents, servants, and employees, and all other bootleggers acting in concert therewith or having knowledge thereof, from manufacturing, distributing, offering for sale or selling Counterfeit Merchandise.

2.     That this Court order that all Counterfeit Merchandise and any records documenting the manufacture, sale, or distribution of Counterfeit Merchandise, found in the possession, custody, or control of Defendants be seized until a hearing can be held before this Court to determine the disposition of any goods so seized.

3.     That Defendants be required to account to and reimburse WWE for any and all profits which Defendants have derived from the sale of any Counterfeit Merchandise and for any and all damages which WWE has sustained by reason of the acts complained of herein, or statutory damages.

4.     That Defendants be required to pay treble the amount of any profits derived from the sale of any Counterfeit Merchandise.

5.     That this Court award WWE its cost and reasonable attorneys' fees in this action.

24

6.    That this Court grant such other and further relief as it deems just and appropriate under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff World Wrestling Entertainment, Inc. hereby demands a trial by jury of all issues so triable.

Dated: March 25, 2022             Respectfully submitted,

*/s/ Darlene F. Ghavimi*
Darlene F. Ghavimi
Trial Counsel
TX Bar No. 24072114
E-mail: darlene.ghavimi@klgates.com
K&L GATES LLP
2801 Via Fortuna, Suite 350
Austin, Texas 78746
Telephone: (512) 482-6800

Artoush Varshosaz
TX Bar No. 24066234
K&L GATES LLP
Artoush.Varshosaz@klgates.com
1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5500

Jerry S. McDevitt (*pro hac vice* motion to be filed)
Curtis B. Krasik (*pro hac vice* motion to be filed)
Christopher M. Verdini (*pro hac vice* motion to be filed)
K&L GATES LLP
K&L Gates Center
210 Sixth Ave.
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500

*Attorneys for Plaintiff, World Wrestling Entertainment, Inc.*

311861647.1

**VERIFICATION**

I am Senior Vice President, Assistant General Counsel - Intellectual Property, Business and Legal Affairs of Plaintiff World Wrestling Entertainment, Inc.  The allegations in the foregoing Complaint that relate or refer to World Wrestling Entertainment, Inc. are true to my own knowledge and as to those allegations that relate or refer to Defendants' activities and that are alleged upon information and belief, I believe them to be true.  I verify under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of March, 2022, in Stamford, Connecticut.

Lauren A. Dienes-Middlen

Senior Vice President, Assistant General Counsel
Intellectual Property, Business and Legal Affairs
World Wrestling Entertainment, Inc.

311861647.1